**Lion Oil Company, Appellee, v. Sinclair Refining Company, Appellant.**

**Gen. No. 32,903.**

94

Opinion filed February 27, 1929.   Rehearing denied March 19, 1929.

WARREN PEASE and WILLIAM R. ALLEN, for appellant; ROY T. OSBORN, of counsel.

CHARLES E. CARPENTER, for appellee.

MR. JUSTICE WILSON delivered the opinion of the court.

The Lion Oil Company, a corporation, plaintiff, brought its action against the Sinclair Refining Company, a corporation, defendant, in an action of trespass on the case for slander through its servants and agents, charging that, by reason of slanderous utterances, the business of the plaintiff was greatly injured and damaged. The trial resulted in a verdict by a jury in favor of the plaintiff, assessing plaintiff's damages at the sum of $100,000, upon which judgment was entered and it is from this judgment that this appeal is perfected.

From the facts it appears that the Lion Oil Company was a corporation organized and existing under the laws of the State of Illinois with an authorized capital at the time of the trial of $150,000. It was engaged in the manufacture and sale of lubricating oils and greases for automobiles and trucks and in the spring of 1925 undertook to sell and distribute gasoline to the trade and particularly to filling stations. The plaintiff's principal place of business was located on Normal boulevard in Chicago near 58th street and it occupied a building approximately 379 feet by 250 feet, in which was located tanks and other equipment used in compounding oils and greases. It appears also that upon the premises there were storage tanks for gasoline with a capacity of 225,000 gallons and a switch track of sufficient length to contain twelve tank cars at one time.

It appears that the branch of the plaintiff's business pertaining to the sale of gasoline grew rapidly until the plaintiff had as customers approximately twenty filling stations in and about the City of Chicago, selling "Lion" gasoline and advertising the "Lion" brand of gasoline upon the premises. These customers were supplied from tank wagons belonging to the plaintiff and it also appears that, in addition to these gasoline stations, plaintiff had certain garage and tank wagon customers. The gasoline was procured by plaintiff from the Mid-Continent Petroleum Company and the Gosden Gasoline Company in tank-car lots, averaging approximately one tank car a day.

Among the filling stations supplied by the plaintiff was the Kimball station which in March, 1926, just prior to the happening of the alleged slanderous statements made by the agents of the defendant in regard to the business of the plaintiff, purchased approximately 5,000 gallons of gasoline a month. The Sauerwein filling station, at or about the same time, was purchasing approximately 5,600 gallons per month. The Stier & Hoyle station was purchasing from the plain-

tiff and selling approximately 5,300 gallons of gasoline per month. The Karlsberg station was buying and selling as high as 7,300 gallons of gasoline. The Hartman filling station bought and sold approximately 13,000 gallons per month. George E. Bay was operating a station where he sold approximately 45,000 gallons per month, all of which were purchased from the plaintiff company. A man by the name of Citro was operating three stations and handling the gasoline of the plaintiff and used approximately 50,000 gallons a month in these three stations.

These stations were customers of the plaintiff and in addition to these there were a number of others, bringing the total number to approximately 20 buying, selling and handling gasoline of the plaintiff. From the facts in evidence it would appear that a fair estimate would show that these filling stations were handling 150,000 gallons of ''Lion'' gasoline a month.

In addition to the handling of the gasoline of the plaintiff, these filling stations were also handling and dealing in its oils and lubricants. The defendant, the Sinclair Refining Company, a corporation, was also engaged in the business of selling oils, lubricants and gasoline, and maintained an office in the City of Chicago and employed a number of salesmen for the purpose of disposing of its products.

Among others, defendant had in its employ a man by the name of Baltes, who appears to have had the title of city sales manager and also assistant district manager. On or about January 29, 1926, there was a meeting of the salesmen of the defendant company held in the City of Chicago at which there were about twenty-five salesmen present, including 8 or 10 whose particular duties were to sell gasoline in bulk, particularly to filling stations in the City of Chicago. At this meeting Baltes presided and delivered a sales talk to those present to the effect that it was necessary for them to

get out and increase the sales of the defendant company. There is testimony in the record that at this meeting Baltes stated that the "Lion" Oil Company was on its last legs and would be unable to supply its customers with gasoline and told the salesmen to go out and concentrate on the "Lion" accounts. Baltes admitted on cross-examination that he mentioned the name of the Lion Oil Company, but only casually, and that he laid no particular stress upon the fact that the Lion Oil Company was going out of business and denied that he stated at the meeting that the Lion Oil Company was failing, or words to that effect.

It does appear, however, that shortly after this meeting a number of the customers of plaintiff were approached by salesmen of the defendant company and were told that the Lion Oil Company was bankrupt, or words to that effect, and that they had better begin to make arrangements to get gasoline from the defendant company which would be able to supply their needs and not to rely upon deliveries by the plaintiff. Sauerwein was told by a certain Omholt, a salesman of the defendant, that the Lion Oil Company was on the rocks and could not pay their help for the last week. Citro was informed by the agents of the defendant that the Lion Oil Company would be out of business within the next few days and was offered $1,000 if he would sign a contract to sell Sinclair gasoline. Hartman, a customer of the plaintiff, was told that the Lion Oil Company was on its last legs and could not last much longer and that he should give the Sinclair Company a chance. Kimball was told by an agent of the defendant that the Lion Oil Company had failed and could not pay their employees their salaries. A number of other customers of the plaintiff were approached by the agents and salesmen of the defendant and were informed that the Lion Oil Company was going out of business and a number of the gasoline stations purchasing oil from the

Lion Oil Company, plaintiff in this case, were offered various sums of money if they would begin accepting deliveries of gasoline from the defendant.

The record is replete with testimony showing that slanderous statements were made by numerous agents and servants, engaged at the time in the business of forwarding and promoting the sales of gasoline for the Sinclair Company. Following these statements offers of cash were made to the owners of the filling stations in question if they would handle gasoline of the defendant company for a period extending over a number of years. So far as the record in this case is concerned, it is apparent that this campaign was carried on as the result of a preconceived and concerted action on the part of the defendant inaugurated at the talk on January 29, 1926, by the sales manager of the defendant. The statements made were evidently for the purpose of promoting the business of the defendant and in the line of employment of its agents. This course of conduct appears to have continued over a period of several weeks, resulting finally in a loss to the plaintiff of all of its gasoline customers some time in April, 1926. Placing the total output of the sales of gasoline to its filling customers at approximately 150,000 gallons a month, at an approximate profit of two cents a gallon, the plaintiff would have suffered a loss of $3,000 per month and, in addition, was deprived of whatever benefit may have accrued to it by the addition of future customers in this particular field of its endeavor, if it had been permitted to continue in the selling of gasoline.

The words used were of such character that they conveyed the meaning to the hearers that the plaintiff company was on the verge of bankruptcy and was about to go out of business. It does not require expert testimony to develop this fact, as the meaning of the words was clear and unambiguous and susceptible only of their ordinary interpretation. In the connection in

which these words were used, they were slanderous *per se.* 36 C. J. 1191. Corporations engaged in competitive business are not barred from fighting for trade and commerce in ways that are legal and justifiable, but the law does not permit them to carry false statements, harmful to competitors and unfounded in fact, for the purpose of procuring such business.

There is ample evidence in the record in support of the proposition that the slanderous statements of the agents received the full support of the defendant, and their acts, in circulating these slanderous and untrue words, were ratified by their employer. Carey G. Wirick, president of the Lion Oil Company, as soon as he heard of the circulation of these reports, talked with Mr. Sus, district manager for the Sinclair Refining Company, then in charge of the Sinclair business in Illinois and several adjoining States, and told him that these remarks had come to his attention. It does not appear, however, that Sus or the Sinclair Company made any effort to put a stop to the slanderous statements, but, on the other hand, openly went on and paid certain proprietors of gasoline stations using Lion gasoline in order to prevail upon them to substitute the gasoline of the defendant for that of the plaintiff. It appears from the testimony that one Pilon was paid $2,500 to quit selling Lion gasoline and to sell the product of the defendant for a period of five years. Stier & Hoyle were also paid $1,600; Sauerwein was paid $400, and offers to pay other customers of the plaintiff were made by the defendant. These statements and offers of payment made by the defendant, following the slanderous statement of their agents and to the same customers of the plaintiff, evidenced a ratification of the acts of the agents in their efforts to put the Lion Oil Company out of business.

It is urged, on behalf of the defendant on this appeal, that, under the law, the defendant should not be held

for the unauthorized utterances of one of its salesmen and cites cases in support of this contention. The rule in this State appears to be that a principal is liable to third persons for a tort which he has expressly authorized or directed his agent to commit. He is also liable for a tort committed by his agent afterward ratified and affirmed by himself. It appears to be the rule also in this State that the principal is liable for the tort of an agent committed within the scope of his employment. In the case at bar it appears from the evidence that the acts of the agents of the defendant, in uttering their slanderous statements concerning the plaintiff, originated at a meeting of salesmen at which they were directed to go out and procure the business of the plaintiff company. From the fact that their statements to the customers of the plaintiff were so similar in character, it would seem that they had received their information at a common source and at approximately the same time. This would lead one to believe that the statements emanated originally from the salesmen's meeting, presided over by Baltes. Moreover, the statements were made by the agents of the defendant while in the course of their employment, as it is apparent they were all made for the purpose of procuring additional business for the defendant. As has already been stated, the fact that this course of slanderous statements was followed by the payment of money by the defendant corporation to the customers of the plaintiff, certainly indicates a confirmation and an affirmance of the acts of its agents in attempting to procure the business of the plaintiff.

This court in the case of *Rosenberg v. Underwriters Salvage Co.,* 190 Ill. App. 64, in its opinion says:

" 'Upon the principle that he who does an act by another does it himself, a principal is liable to third persons for the torts which he has expressly authorized or specially directed his agent to commit.

" 'The liability of the principal for torts committed by his agent is not limited to torts which he has expressly authorized or directed; he is liable for all the torts which his agent commits in the actual or apparent course of his employment; and if the agent commits a tort in the apparent course of his employment the principal is liable therefor even though he was ignorant thereof and the agent in committing it exceeded his actual authority or disobeyed the express instructions of his principal. Thus a principal is civilly liable to third persons where his agent, while acting within the scope of his real or apparent authority, is guilty of assault and battery, conversion, fraud, or trespass; and he is also liable for the negligence of his agent resulting in injury to person or property.

" 'A principal is not liable for the torts which his agent commits when not acting in the course of the employment, unless he subsequently ratifies them. Nor is a person liable for the torts of one who does not bear to him the relation of agent, unless he has so acted in permitting the alleged agent to represent him that he is estopped to deny the agency. . . .' " To the same effect see *Margolis v. United Dairy Co.*, 214 Ill. App. 613; *Wood v. Williams*, 142 Ill. 269; *Oxford v. Peter*, 28 Ill. 434.

Ample support of this rule is also found in other jurisdictions and we believe the weight of authority supports the rule that a corporation is answerable for libel or slander published or uttered by an agent while acting within the scope of his agency. *Kharas v. Collier, Inc.*, 171 App. Div. (N. Y.) 388; *Fogg v. Boston & L. R. Corp.*, 148 Mass. 513; *Bruce v. Reed*, 104 Pa. St. 408; *Grand Union Tea Co. v. Lord*, 231 Fed. Rep. 390.

Upon the trial of the cause, four witnesses testifying on behalf of the plaintiff were asked the question as to whether they believed the statements that were made to them by the agents of the defendant and also whether

the statements so made had anything to do with their discontinuing their sale of Lion gasoline. The statements referred to were the slanderous utterances to the effect that the Lion Oil Company was on the verge of bankruptcy and was going to discontinue its gasoline business and similar words to the same effect. It is urged that this is error on the ground that facts only are admissible in evidence and opinions forbidden. It is further urged as a ground for reversal that one of the witnesses was asked his understanding of the meaning of the words. We cannot see any valid ground for reversing this judgment for the reasons advanced.

The witnesses testifying were also the customers of the plaintiff, alleged to have been caused to discontinue the use of the plaintiff's gasoline by reason of the slanderous statements. They did not occupy the position of disinterested witnesses whose opinion might be sought as a matter of evidence for the purpose of showing what the world at large would believe by the uttered statements. They were asked whether or not they believed the statements and relied upon them for the purpose of sustaining the charge in the declaration that they had been caused to discontinue as customers of the plaintiff because of the alleged slanderous statements of the defendant's agents. No better proof of this fact could be obtained than by asking the witnesses whether or not, as customers, they believed the statements and discontinued the use of plaintiff's gasoline by reason thereof.

The Supreme Court of this State in the case of *Pfiester v. Western Union Tel. Co.*, 282 Ill. 69, had occasion to consider a very similar question. From the facts in that case it appeared that Pfiester had sued to recover damages by reason of the failure of the Western Union Telegraph Company to deliver a message to him which contained an offer of employment, and, as a result, he lost a very profitable position. During the

course of the trial he was asked whether he would have accepted the terms contained in the message if he had received it. The court in its opinion says:

"On the trial plaintiff was permitted to testify, over objection, that he would have accepted the terms offered by the Milwaukee club had he received the message. This evidence, it is insisted, was inadmissible, being too speculative and conjectural, and was but plaintiff's conclusion based upon a condition which did not exist at the time the message should have been delivered and was arrived at in the light of events which had subsequently transpired. Plaintiff's offer by telegram to work for the Milwaukee club for $3000 for the 1912 season was not accepted. A counter-position or offer was made plaintiff the same day to pay him $300 per month. This offer by telegraph never reached plaintiff, hence was not accepted, to thus consummate a contract. Of course, if plaintiff would not have accepted the terms offered in this message he suffered no loss in its not having been delivered. If he would have accepted its terms then the failure to deliver the message occasioned loss to plaintiff. This court has never directly passed upon the admissibility of evidence of this character, and the decisions of courts of other States are conflicting on the question. The courts of Indiana, Kentucky, West Virginia, Georgia and some other States have ruled against the admissibility of such testimony, while a less number of courts have ruled to the contrary. Under the particular facts involved in some, at least, of the cases where the admissibility of the testimony has been ruled against we would not disagree with the decisions, but we cannot accept them as laying down a rule of evidence to be applied in this case. Plaintiff, alone, knew whether he would have accepted the offer of the Milwaukee club had he received it. Certainly his testifying he would have done so would not be conclusive if his acts and conduct

contradicted his statement. We are unable to see why it was not competent for plaintiff to testify whether he would have accepted the offer at the time it was made. How, otherwise, under the state of facts here involved, could a plaintiff make a case for the recovery of damages? If plaintiff would have accepted the offer made by the Milwaukee club he clearly sustained damages.''

The very gist of the action brought by the Lion Oil Company was that it had sustained damages by reason of certain slanderous statements made to its customers and which its customers believed and relied upon and which caused them to discontinue their business connections with the plaintiff. Under the circumstances no one could testify to this fact better than the customers. Certainly on cross-examination the questions would have been competent and we see no reason why they were not also competent on direct.

As to the objection that a witness had testified as to his understanding of the words uttered, we see no objection to the interpretation placed upon them by the witness, as it added nothing to the words themselves, which were clearly understandable to anyone and required no interpretation. The words uttered did not come within the rule applicable where a certain secret meaning may be gathered from the use of certain words and which require evidence to prove the secret meaning. The witness who was asked the question as to what he understood the meaning of the words to be was a customer and, as such, stated that he understood the words to be to the effect that the plaintiff company was failing and, believing the statements to be true, discontinued his business relations with the plaintiff.

It is also urged as ground for reversal that the court erred in giving two certain instructions, numbers 6 and 7, in behalf of the plaintiff, which contained words to the effect that the jury were not confined to awarding damages for a mere pecuniary loss, but might assess

damages as a punishment in the event they found the defendant was actuated by malice in fact. The objection to these instructions is based upon the ground that there is no evidence of the financial worth of the defendant and that there is no evidence in support of the fact that the utterances were authorized by the defendant. From the record it appears that the defendant employed 25 salesmen in the Chicago territory alone; operated 10 bulk plants in Chicago; maintained offices in New York City; employed a district manager for the territory comprising Illinois, Indiana, Ohio, Michigan, Wisconsin and Kentucky, known as the Central district; maintained two offices in Chicago and a city sales manager; was engaged in the business of refining and producing petroleum and was a nationally advertised company throughout 45 states in the Union, with its product known practically all over the world and was one of the major companies engaged in the manufacture and production of petroleum. Its payment of large sums of money to the customers of the plaintiff for the purpose of controlling them as distributors; its offer to install and furnish equipment for filling station customers, were all facts bearing on the question of the wealth of the defendant.

The words themselves were slanderous *per se* and, therefore, malice could be implied. There is ample evidence in support of the proposition that the uttering of the slanderous words was encouraged and ratified by the defendant.

This court in the case of *O'Malley v. Illinois Publishing & Printing Co.,* 194 Ill. App. 544, in its opinion says:

"As the words were libelous *per se,* a sufficient foundation for the recovery of punitive damages was laid. *Hintz v. Graupner,* 138 Ill. 158.

"While we regard the actual damage suffered by plaintiff as inconsequential, the words being actionable

*per se* and malice being abundantly proven, it was not necessary to prove any actual damage to entitle plaintiff to recover punitive damages. We are satisfied, in view of the vindictiveness of defendant's actions, as evidenced by its malicious repetition of the libel, that the damages assessed were quite within bounds.''

The law implies malice where the words are untrue and slanderous *per se* and, under such circumstances, the jury may award exemplary damages. *Hintz v. Graupner,* 138 Ill. 158; *Cooper v. Illinois Publishing & Printing Co.,* 218 Ill. App. 95; *Singer Mfg. Co. v. Holdfodt,* 86 Ill. 455.

In view of the fact that the actual money loss, as established by the plaintiff, was approximately $30,000 a year, we cannot say that the damages were excessive, and it may well be believed that the jury awarded only actual damages as shown by the evidence. We, therefore, see no reversible error in the giving of the instructions Nos. 6 and 7 on behalf of the plaintiff. We do not regard the verdict as excessive, but we do believe that the verdict and judgment are amply supported by the evidence, not only to the effect that the servants and agents of the defendant uttered the slanderous statements charged, but that their action was indorsed and ratified by the defendant company and that its conduct was contrary to fair dealing and fair competition.

For the reasons stated in this opinion the judgment of the circuit court is affirmed.

*Judgment affirmed.*

HOLDOM, P. J., and RYNER, J., concur.